UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                                    <u>For Online Publication Only</u>
-------------------------------------------------------------X
JUAN GOMEZ,

                      Petitioner,

            -against-                                    **<u>MEMORANDUM AND ORDER</u>**
                                      17-CV-7249 (JMA)
THOMAS GRIFFIN,

                  Respondent.                   **<u>REDACTED</u>**[*]
-------------------------------------------------------------X
**APPEARANCES:**

Juan Gomez
       *<u>Pro se</u> Petitioner*

Rosalind C. Gray, Assistant District Attorney
Suffolk County District Attorney's Office
200 Center Drive
Riverhead, NY 11901
       *Attorneys for Respondent*

**AZRACK, United States District Judge:**

       On May 13, 2014, following a jury trial in state court, Juan Gomez ("Gomez") was convicted of one count of Murder in the Second Degree and one count of Conspiracy in the Second Degree.  On June 13, 2014, Gomez was sentenced to two indeterminate sentences of twenty-five years of imprisonment to life on the Murder in the Second Degree count and eight and one third years to twenty-five years of imprisonment on the Conspiracy in the Second Degree count, with both sentences to run concurrently.

       Gomez, proceeding <u>pro se</u>, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising various grounds for relief.  For the following reasons, all of Gomez's proffered grounds are either procedurally barred or without merit.  Therefore, the petition is DENIED in its entirety.

---

[*] As explained in the Court's March 31, 2021 Order, the complete and unredacted version of this Memorandum & Order was issued on March 26, 2021.  This redacted version of the Memorandum & Order was issued on March 31, 2021.

The following facts are taken from the petition and the state court record.[1]

## A. **Factual Background**

Leodan Bonilla ("Bonilla"), also known as "Tweety", was sixteen years old when he moved to Brentwood, New York after being born and raised in El Salvador.  (Tr. 1586-1587.) Upon attending high school in Brentwood, Bonilla began associating with members of the street gang known as MS-13, or Mara Salvatrucha.  (Tr. 256, 276.)

MS-13 is an El Salvadorian street gang that began in California.  (Tr. 216.)  MS-13 is divided into cliques, typically by location, but most cliques follow the same rules.  The clique that Bonilla interacted with was KLS, or Karlington Loco Salvatrucha.  (Tr. 227, 494.)  KLS was a new clique that grew out of ILS, or Islip Loco Salvatrucha, in early 2010.  (Tr. 227, 494.)  MS-13 leadership in El Salvador had ordered ILS to disband because ILS was not upholding the violent standards expected of an MS-13 clique.  (Tr. 232.)  ILS had previously been focused on smoking marijuana, drinking, and partying, rather than committing robberies, killing and beating rival gang members.  (Tr. 227, 232, 504.)

Once ILS became KLS, the clique more strictly followed the rules established and expected by MS-13.  KLS appointed a new primero and segundo cabeza, or first and second head, to act as the president and vice president of the clique.  (Tr. 501, 622.)  The new primero and segundo cabeza were committed to making KLS more violent like the MS-13 cliques from El Salvador. (Tr. 231, 267, 292-93, 1852-53.)  As a result, KLS allowed some of the older members to retire, and younger members of ILS were allowed to join other cliques rather than stay in KLS.  (Tr. 333, 1852-83, 1969.)  Although some former ILS members joined other cliques, it was not uncommon for members of different MS-13 cliques to socialize or commit crimes together.  (Tr. 506.)

---

[1] "Tr." refers to the trial transcript, People v. Gomez Trial Tr., April 11, 14-18, 21-25, 28-30, 2014, May 1-2, 5-9, 12-13, 2014.  "S." refers to the transcript for the sentencing proceedings, People v. Gomez S. Tr., June 13, 2014.

Once formed, KLS began strict adherence to the violent rules of MS-13.  For example, in order to join the clique, a new member would need to be "jumped in," meaning that the new member would be beaten by three existing gang members for thirteen seconds to ensure the new member could withstand pain.  (Tr. 217, 505-506.)  If a gang member did not follow the rules, they would be subjected to a beating known as a calenton, in which all the members of the clique would beat the offending member for either thirteen seconds, or an arbitrary period of time, such as the time it takes to smoke a cigarette.  (Tr. 516, 318-19.)  KLS also followed the rules involving cooperating with law enforcement, colloquially known as "ratting" or "snitching."  (Tr. 239.)  If a gang member was arrested, upon release from custody that member was required to produce what the gang referred to as "papers."  (Tr. 240.)  "Papers" included any documentation created after a gang member was arrested and were to be produced to gang leadership to prove that the arrested member did not speak to law enforcement about the gang.  (Tr. 239-240.)  If a member was found to be cooperating with law enforcement, or if the member refused to produce papers, that member could receive a "green light."  (Tr. 239-240.)  A green light is a death sentence.  (Tr. 239.)

In April 2010, Bonilla was arrested and charged with possession of a forged instrument. (Tr. 722-23.)  Bonilla later pled guilty to disorderly conduct in full satisfaction of the charges against him and served a fifteen-day sentence in jail.  After serving his sentence, Bonilla was transferred to ICE custody where $5,000 bail was set, as he was not a legal United States resident. (Tr. 724-25, 1590- 91.)  Bonilla's family posted bail in May 2010, and upon his release, Bonilla moved in with his brother's family.  (Tr. 160, 1586, 1596-97.)

Following Bonilla's release, the KLS segundo cabeza was arrested in April 2010 for weapon and drug possession and was ultimately released from custody in July 2010.  (Tr. 297.) Later, the primero cabeza of KLS was also arrested in September 2010, but was released into

federal custody on an immigration hold and was ultimately deported.  (Tr. 730.)  After the segundo cabeza's release, and after the primero cabeza had been arrested, the segundo cabeza began to suspect that Bonilla was a "rat."  He shared his suspicions with KLS members Witness #1 and Wilmer Zuniga ("Zuniga"), also known as "Chewy", at O'Neil Park, near the Central Islip train station.  (Tr. 298, 302.)  Because he and the primero cabeza had been arrested, and Bonilla had been released on bail while the primero cabeza was being held on an immigration hold, he believed that Bonilla was a "snitch" and told Witness #1 and Zuniga not to speak to or hang out with Bonilla. (Tr. 304.)  While Bonilla had shown his "papers" to Witness #1 after his release, the segundo cabeza believed that Bonilla was a "snitch" until he was able to see the primero cabeza's "papers." (Tr. 296, 304.)  Zuniga, who was very close friends with the segundo cabeza, supported him and agreed that Bonilla was a "rat."  (Tr. 305.)

The segundo cabeza continued to tell KLS members that he believed Bonilla was a rat.  At one of the meetings held in October 2010, probationary KLS member Witness # 2, was present. (Tr. 310.)  Juan Gomez ("Gomez"), the petitioner, also known as "Titantic", was also present at the same meeting.  Gomez was a member of the Lewa clique but would frequently associate with KLS and attend their cut parties and clique meetings. [2]  (Tr. 269-70, 312-313, 989.)

At the October 2010 meeting, the segundo cabeza again discussed that he believed that Bonilla was a "rat," but did not have proof.  (Tr. 315.)  At that same meeting, Witness #1 received a calenton, a disciplinary beating, for disobeying the order to stop hanging out with Bonilla.  (Tr. 308, 317-20.)  Witness #1 was beaten by members of KLS for the length of time it took Gomez to smoke a cigarette.  (Tr. 317-20.)

---

[2] Cut parties are parties thrown in the middle of the school day by gang members rather than attending classes.  (Tr. 269.)

On a later date, during a phone call between the primero and segundo cabeza, they discussed again their belief that Bonilla was a "snitch."  (Tr. 623–24.)  KLS member Witness #3 ("") was also present and overheard the phone conversation.  (Tr. 600, 623.)  Witness #3 overheard that the primero cabeza saw Bonilla in immigration court, and as a result believed that the segundo cabeza "had gone to jail" because Bonilla had "ratted" on him.  (Tr. 624.)  Following the phone call, the segundo cabeza stated to both Witness #3 and Zuniga that Bonilla was a "rat" and that he needed to disappear.  (Tr. 626.)  Later, at another KLS meeting where Witness #3, Zuniga, and Gomez were present, the segundo cabeza informed the members that they had a "green light" to kill Bonilla.   (Tr. 627-68.)  While Witness #3 did not agree with the decision to kill Bonilla, he kept silent out of fear that he would also be killed for speaking up against the segundo cabeza.  (Tr. 628-30.)

After the meeting where Bonilla was given the "green light," Gomez and Zuniga began making plans to murder him.  (Tr. 1141-42.)  As stated above, Witness #2 was a probationary member of KLS, and upon joining KLS, he was informed that he had three months to kill someone or risk being killed himself.  (Tr. 1143.)  In late fall 2010, Gomez, Zuniga, and Witness #2 were in Gomez's truck discussing killing Bonilla for being a "snitch" and Gomez and Zuniga told Witness #2 to get ready.  (Tr. 1141-42.)  Witness #2 understood "get ready" to mean that at some time, Gomez and Zuniga would call on Witness #2 to murder Bonilla.  (Tr. 1144.)  Thereafter, Witness #2 tried to avoid both Gomez and Zuniga by ignoring their calls and not answering the door to his home if he saw them parked outside.  (Tr. 1144-46.)

On the evening of December 2, 2010, Gomez and Zuniga came to Witness #2's home.  (Tr. 1146.)  Witness #2 was home alone and saw Gomez's van in front of his house.  (Tr. 1147.)  Gomez came to the front door and told Witness #2 to put on double clothing because they were

going to do it now.  (Tr. 1147.)  Gomez also gave Witness #2 a pair of black gloves and told him to leave his cell phone at home.  (Tr. 1147-48.)  Witness #2 left with Gomez and Zuniga, and Gomez drove them to an OK Petroleum gas station located at the intersection of Fifth Avenue and Pine Aire, where he parked behind the parking lot, outside the view of security cameras.  (Tr. 815, 953, 1154, 2285- 87.)

Gomez got out of the van, and walked to the gas station's pay phone where he called Bonilla at 8:34 p.m.  (Tr. 953, 1156, 2268, 2383-84.)  Zuniga and Witness #2 remained in the van. While they waited for Gomez to return, Zuniga reached into his sweater and pulled out a black and silver automatic handgun and showed it to Witness #2, saying, in sum and substance, that they were going to use this to do it.  (Tr. 1157-60.)  Gomez then came back to the van and told Zuniga and Witness #2 they were going to pick up Bonilla, and Zuniga put the gun back in his sweater. (Tr. 1160.)

Gomez, Zuniga, and Witness #2 left the gas station and went directly to Bonilla's home to pick him up.  (Tr. 1164.)  Bonilla left his home dressed in a blue hat, black jacket, and white shoes, and got into the backseat of Gomez's van.  (Tr. 1164, 1169.)  During the drive, Gomez told Bonilla that they were going to hang out with some girls and smoke marijuana, and Bonilla did not suspect anything was amiss.  (Tr. 1164-65.)  Gomez parked the van in front of a house on Emkay Street in Bay Shore.  (Tr. 1166-67.)  Gomez, Zuniga, Witness #2, and Bonilla each exited the van, and walked down the block towards the dead end of Spur Drive.  (Tr. 1166-67.)

At the dead end of Spur Drive there is a broken metal chain link fence; behind that fence is a wooded area behind the Southern State Parkway.  (Tr. 133, 149, 1171–72.)  Gomez, Zuniga, Witness #2, and Bonilla each entered the wooded area through the broken fence, and Gomez pointed to a house near the dead end and told Bonilla "this is where the girls are going to come out

of." (Tr. 1169.) After walking approximately five to seven feet into the wooded area, they all stopped walking. Only Gomez, Zuniga, and Witness #2 were wearing gloves. (Tr. 1168.)

Zuniga removed the handgun and pointed it at Bonilla; it only clicked. (Tr. 1174.) Confused, Bonilla said "homie don't play that way." (Tr. 1175.) Zuniga then tried again and shot Bonilla in the face causing him to fall face down onto the ground. (Tr. 1176-78.) As Bonilla lay on the ground choking on his own blood, Zuniga handed the gun to Gomez, who shot Bonilla a second time in the back. (Tr. 1177-79.) Gomez then handed the gun to Witness #2, who also shot Bonilla in the back. (Tr. 1179-80.) Gomez, Zuniga, and Witness #2 ran out of the wooded area leaving Bonilla laying face down on the ground. (Tr. 1184.)

After leaving the woods, Gomez and Zuniga brought Witness #2 home and told him to wash his hands with urine to get rid of any gun powder on his hands. (Tr. 1212.) The following day, Gomez and Zuniga came back to Witness #2's house to burn Witness #2's clothing he wore the night before. (Tr. 1214.) The next day, Witness #2 saw the segundo cabeza, and he instructed Witness #2 to tell anyone who asked about Bonilla's murder that the Latin Kings, a rival gang, were responsible. (Tr. 1215.) Following Bonilla's murder, both Gomez and Zuniga got tattoos of "M.S.," which signified that they had killed someone. (Tr. 1216.)

Early in the morning of December 8, 2010, a local contractor was in the vicinity of Emkay Street and Spur Drive for a contracting job. (Tr. 87.) He drove his truck to the end of the block by the dead end and began to make a U-turn. (Tr. 89.) As he made the U-turn, he saw a body laying on the ground in the wooded area. (Tr. 89.) The contractor got out of his work truck and called out to the person laying on the ground and moved closer to the body. After seeing that this person was unresponsive and had something black in the middle of their head, the contractor called 911. (Tr. 89-91.)

A Suffolk County Police officer responded first to the scene and approached the body.  (Tr. 117.)  The officer observed the person to be wearing a dark jacket and blue jeans and observed what appeared to be a gunshot wound to the back of the head.  (Tr. 119-20.)  The first responding officer also set up a crime scene until New York State Police ultimately took over the investigation.[3]  (Tr. 120, 149.)  Bonilla's family members, who had been looking for him since he went missing on December 2, 2010, came to the crime scene and positively identified the body as Leodan Bonilla.  (Tr. 1601, 2603, 2650.)

New York State Police Investigator Thomas Hughes was the senior investigator assigned to investigate Bonilla's death.  (Tr. 2647-48.)  Both Investigator Hughes and New York State Police Investigator Jason Robles responded to the scene where Bonilla's body was found on December 8, 2010.  (Tr. 2649.)  Investigator Robles worked within the New York State Police gang division and has specialized knowledge of Latino gangs, including MS-13.  (Tr. 485-83, 492.)  Based on evidence from the scene, investigators believed that Bonilla's death had been a gangland style murder committed by people known to Bonilla.  (Tr. 2654.)  First, Bonilla appeared to be a gang member based on his attire and tattoos.  (Tr. 2652.)  Second, there was no evidence of a struggle, that Bonilla had been robbed, or that his body had been dragged to the location. (Tr. 2652-54.)  Additionally, the area where Bonilla was killed was a known gang-prone location, specifically frequented by MS-13.  (Tr. 2654.)

Using information gathered from a separate wiretap investigation by the Suffolk County Police Department, Investigator Hughes identified Gomez, Zuniga, and Witness #2 as suspects in Bonilla's murder.  (Tr. 2690-91.)  Investigator Hughes also learned that Zuniga and Witness #2 were members of the KLS clique, and Gomez was a member of Leeward, or Lewa.  (Tr. 2693.)

---

[3] Bonilla's body was found near Southern State Parkway, within the jurisdiction of the New York State Police, and, thus, State Police conducted the investigation into Bonilla's murder.  (Tr. 133.)

Through the investigation, Investigator Hughes also identified other known gang members and associates, including the segundo cabeza, Witness #4, Witness #5, Witness #1, and Witness #3. (Tr. 2694.)  Investigator Hughes also learned that Bonilla was a member of KLS.

On July 20, 2011, with the assistance of other units, Investigator Hughes and other investigators contacted and interviewed many of the known gang members, including Zuniga, Witness #2, and Gomez, at the police barracks.  (Tr. 2696.)  While Gomez admitted that he was a gang member and associated often with the KLS clique, he did not admit any culpability with respect to Bonilla's murder.  (Tr. 2748.)  Gomez also admitted that he had spoken to Witness #4 about Bonilla being a "snitch."  (Tr. 2749.)  Investigator Hughes further questioned Gomez about December 2, 2010, the night Bonilla was murdered.  Gomez told Investigator Hughes that he called Bonilla from the OK Petroleum gas station, but did not remember the time, nor did he remember whether Zuniga and Witness #2 were with him.  (Tr. 2751-53.)  Gomez also stated that he picked Bonilla up from his house, but that they definitely did not go to Emkay Street.  (Tr. 2751, 2758, 2760.)  After their respective interviews, both Zuniga and Gomez were permitted to leave the police barracks.  (Tr. 2762-63.)

Witness #2 also spoke with police on July 20, 2011 and confessed to killing Bonilla with Gomez and Zuniga.  Following his interview, Witness #2 was arrested and charged with murder. (Tr. 2765-66.)  While Witness #2 had confessed to the murder and provided enough probable cause to arrest both Gomez and Zuniga, Investigator Hughes continued to investigate before making an arrest.  (Tr. 2766-67.)  As part of that investigation, Investigator Hughes continued to speak with other members of KLS.   Investigator Hughes was also in possession of video surveillance from a grocery store near Bonilla's house.  (Tr. 2666.)  Investigators were able to corroborate that Bonilla was murdered on December 2, 2010 because that was the last date he was recorded by the video

surveillance, and cell phone records showed that no phone calls were made from Bonilla's cell phone after that date. (Tr. 821, 2666–67.)  Additionally, video surveillance captured Gomez's van driving towards Bonilla's house at 8:38 p.m. on December 2, 2010, just four minutes after phone records indicated Gomez called Bonilla from OK Petroleum. (Tr. 2796.)  December 2, 2010 was also the last date Bonilla was seen by his family. (Tr. 2663-64.)

Gomez and Zuniga were arrested for their role in Bonilla's murder, and Gomez was tried in New York Supreme Court, Suffolk County, starting on March 31, 2014. (Supp. Hr'g Tr. 1.)  At trial, the prosecution presented numerous witnesses against Gomez, including former MS-13 gang members Witness #4, Witness #3, Witness #1, Witness #5, andWitness #6.  Witness #2 also testified about the events of December 2, 2010.

Prior to the trial, the trial court granted, in part, the prosecution's <u>Molineux</u> application.[4] (Tr. 86.)  The trial court ruled that evidence concerning gang membership, rules, and hierarchy were highly probative of Gomez's motive, intent, and identity.  Further, testimony regarding gang rules was necessary as background material relating to the prosecution's allegation that Bonilla's murder was a gang-style assassination. (Tr. 86.)  At trial, Witness #4, Witness #3, Witness #1, and Witness #5 each testified about the rules of MS-13, gang hierarchy, and membership.  Each also testified that, by testifying in court, they each likely received a "green light," or death sentence, by virtue of their cooperation with law enforcement. (Tr. 239, 643, 895, 1024.)  Witness #1 and Witness #5 also explained that a gang member could receive a "green light" if they got certain tattoos. (Tr. 244, 978.)  For example, a tattoo stating "M.S." anywhere on the body indicates that

---

[4] Under New York law, evidence of prior crimes or bad acts is admissible to prove a specific crime if it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime.  <u>People v. Molineux</u>, 168 N.Y. 264 (1901).  Here, the prosecution made an application before the criminal trial commenced seeking to use such evidence against Gomez to establish motive, intent, and identity. (Tr. 86.)

the member had killed someone.  (Tr. 245, 978.)  If a gang member were to get an "M.S." tattoo without having killed someone, the consequence would be a "green light".  (Tr. 244-46, 978.) Investigator Jason Robles testified as an expert in Latino gangs, and corroborated the testimony of the other witnesses regarding the violent nature and rules of MS-13.

The former gang members also testified that members of KLS believed that Bonilla was a "snitch."  Witness #1 testified that the segundo cabeza, the acting head of KLS, informed him that Bonilla was a snitch in Gomez's presence.  (Tr. 311-12.)  Witness #3 also testified that the segundo cabeza told him, Zuniga, and Witness #1 that Bonilla was a snitch, and thereafter he ordered Zuniga and Gomez to kill Bonilla.  (Tr. 624, 630.)  According to both Witness #4 and Witness #5, Gomez had told each of them that Bonilla was a "rat" prior to his death.  (Tr. 878, 1009, 1011.) Witness #4 also testified that Gomez had told him not to repeat that Gomez had said Bonilla was a "rat."  (Tr. 893.)

Additionally, Witness #4 recounted that about one month after Bonilla's death, he was smoking with Gomez in Gomez's truck.  (Tr. 881.)  Gomez told Witness #4 that he went to Witness #2's house with Zuniga to "get a body," which Witness #4 testified meant to kill someone.  (Tr. 882-83.)  Gomez further told Witness #4 that Zuniga and Witness #2 did a shooting, but would not say who they killed.  (Tr. 885.)  Witness #4 also testified that prior to Bonilla's death, Gomez did not have an "M.S." tattoo, but mere weeks following Bonilla's death Gomez had a "M.S." tattoo on his chest, indicating that Gomez had killed someone.  (Tr. 888-89.)

A medical examiner employed by the Suffolk County Medical Examiner's Office examined Bonilla's body and testified at trial to her findings.  The medical examiner testified that Bonilla had suffered three gunshot wounds: one to his right temple, one to the back of his head, and the third to his chin.  (Tr. 2589, 2591-92.)  Any of the three gunshots could have killed Bonilla.

11

(Tr. 2605.)  The environment where Bonilla's body was found and the condition of the body were consistent with Bonilla being murdered on December 2, 2010.  (Tr. 2610.)  The medical examiner recovered two of the three small caliber bullets from Bonilla's body.  (Tr. 1686, 1690.)

Witness #6 testified about the murder weapon.  Witness #6 was a member of the dissolved ILS clique, and moved to the Normandy clique of MS-13 after KLS was formed.  (Tr. 1852.) Witness #6, along with other members of the Normandy clique, purchased a small semiautomatic .25 caliber handgun prior to Bonilla's death.  Witness #6 next saw the gun in Spring 2011 when Zuniga gave it to him, with fewer bullets in the ammunition box.  (Tr. 1865, 1867.)  After giving him the gun, Zuniga told Witness #6 not to get stopped by the police on his way home, and to get rid of the gun.  (Tr. 1866.)  After the police attempted to interview Witness #6, he threw the gun into a ditch in a wooded area.  (Tr. 1878-79.)  Once Witness #6 received immunity for the gun possession charge, he helped the police locate the gun.  (Tr. 1888-89.)

Relevant to this petition, at trial the prosecution did not call Investigator Sean Michael Pagano.  Investigator Pagano was assigned to the Valley Stream barracks of the New York State Police and assisted with the interviews conducted on July 20, 2011.  (Tr. 2697, 2963.)  Specifically, Investigator Pagano picked Gomez up and brought him to the barracks for questioning. (Tr. 2724.) During the charge conference, defense counsel requested a missing witness charge with respect to Investigator Pagano.  (Tr. 3064-67.)  The trial court denied defense counsel's request.  (Tr. 3071-73.)

Also of note to this petition, the trial court instructed the jury that, under New York law, they could not convict the defendant based solely on the testimony of an accomplice unless that testimony was corroborated.  The court also instructed the jury that it was up to them to determine whether Witness #6 was an accomplice.  (Tr. 3340-42.)

On May 13, 2014, Gomez was found guilty of Murder in the Second Degree, Penal Law § 125.25, and Conspiracy in the Second Degree, Penal Law § 105.15.  On June 13, 2014, the trial court sentenced Gomez to two indeterminate sentences, twenty-five years to life for Murder in the Second Degree, and eight-and-one-third to twenty-five years for Conspiracy in the Second Degree, with both terms to run concurrently.  (S. 12-13.)

## B. Post-Conviction Proceedings

### 1. The Direct Appeal

On October 1, 2015, Gomez appealed his conviction to the Second Department of the New York State Appellate Division.  On appeal, Gomez argued: (1) that the trial court erred when it failed to grant defense counsel's request for a missing witness charge; (2) the trial court erred when it allowed testimony describing the violent nature of the MS-13 gang; (3) the trial court erred by instructing the jury that it was for the jury to decide whether Witness #6 was an accomplice because the evidence demonstrated he was an accomplice as matter of law; (4) the prosecutor committed prosecutorial misconduct during summation; (5) his conviction was against the weight of the evidence; and (6) the sentences imposed were harsh and excessive.  (See Def.'s App. Br., October 1, 2015 ("App. Div. Br."), at 27-65, ECF No. 30-68.)[5]

The Second Department affirmed Gomez's conviction.  People v. Gomez, 138 A.D.3d 1017 (N.Y. App. Div. 2d Dep't 2016).  With regard to the missing witness jury charge claim, the court found that the claim lacked merit as the "defendant failed to make a prima facie showing that the uncalled witness could be expected to have knowledge about a material issue in the case or that his testimony would be favorable to the People."  Gomez, 138 A.D.3d at 1018.  Further, the court found that Gomez's sentence was not excessive.  Id., at 1019.  With respect to the remaining

---

[5] The Court uses the pagination assigned by the electronic case filing system for ECF No. 9-25.

claims, the Second Department found that the claims were both unpreserved for appellate review and without merit.  Id.

On July 7, 2016, the New York State Court of Appeals denied Gomez's request for leave to appeal.  People v. Gomez, 27 N.Y.3d 1151 (N.Y. 2016).

### 2. The Instant Petition

Gomez filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 4, 2017, asserting six grounds for relief: (1) that his due process rights were violated when the trial court denied his request for a missing witness charge; (2) that his right to a fair trial was violated when the trial court allowed into evidence testimony concerning MS-13 that was not probative and prejudiced Gomez; (3) the trial court denied him his right to a fair trial by giving an improper jury instruction regarding whether a witness was an accomplice by fact; (4) that the prosecution committed prosecutorial misconduct by making certain comments during summation; (5) that his due process rights were violated when the prosecution failed to meet its burden of proof beyond a reasonable doubt; and (6) his sentence was harsh and excessive, thus violating his rights against cruel and unusual punishment.  (See Pet. at 3-12, ECF No. 4-14.)[6]  For the reasons discussed below, all of Gomez's claims are either procedurally barred or without merit.  Thus, the instant petition is DENIED in its entirety.

---

[6] The Court uses the pagination assigned by the electronic case filing system for ECF No. 1.

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner may file a habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must demonstrate: (1) the exhaustion of state remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions. <u>See</u> <u>id.</u> § 2254.

#### 2. Exhaustion

A court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). This requirement first allows state courts the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" <u>Jackson v. Edwards</u>, 404 F.3d 612, 619 (2d Cir. 2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)). Thus, a petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered. <u>Daye v. Att'y Gen. of N.Y.</u>, 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" <u>Jackson v. Conway</u>, 763 F.3d 115, 133 (2d Cir. 2014) (quoting <u>Carvajal v. Artus</u>, 633 F.3d 95, 104 (2d Cir. 2011)).

### 3. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012).  This procedural bar applies even if the state court addressed a claim's merits in the alternative, but decided that claim on independent procedural grounds.  Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).  When a state court has dismissed a claim based on a state procedural rule, the petitioner is procedurally barred from raising that claim in a § 2254 petition unless the petitioner can meet certain exceptions discussed below.

To overcome a procedural bar a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  To demonstrate cause, a petitioner must put forth that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials … made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted).  A petitioner may also satisfy the cause

requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation.  See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016); Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999).

As for the prejudice requirement, the petitioner must demonstrate that counsel's errors (or any other basis invoked by the petition to establish cause) not only "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage…" United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Even if a petitioner cannot establish cause and prejudice, a federal court may excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result.  For example, a petitioner can overcome a procedural bar by showing "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)).  To prevail, the petitioner must put forth "new reliable evidence … that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

Finally, it must be noted that "[t]he concepts of procedural bar and exhaustion often interact in an important way." Dominguez v. Rock, No. 12-CV-3269, 2016 WL 542120, at *5 (E.D.N.Y. Feb. 9, 2016). "If a § 2254 petitioner has failed to present a claim to a state court but can no longer do so – for example, if the time to file a state-court appeal has passed – then that claim is considered procedurally barred rather than unexhausted." Id. (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999)); Lloyd v. Walker, 771 F. Supp. 570, 574 (E.D.N.Y. 1991) (noting that "[w]hen a petitioner has not properly presented his claim to a state for consideration on the merits, but it is clear that the state court would hold the claim procedurally barred, . . . the exhaustion requirement

17

is satisfied," but, nonetheless, the petitioner is barred from litigating the merits of that claim in federal habeas proceedings) (internal quotation marks and citation omitted).

### 4. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring). A decision involves an "unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694

18

F.3d 225, 234 (2d Cir. 2012) (quoting <u>Hardy v. Cross</u>, 132 S. Ct. 490, 491 (2011) (per curiam)). This standard is "'difficult to meet,'" and for good reason. <u>White v. Woodall</u>, 134 S. Ct. 1697, 1702 (2014) (quoting <u>Metrish v. Lancaster</u>, 133 S. Ct. 1781, 1786 (2013)), <u>reh'g denied</u>, 134 S. Ct. 2835 (2014).  A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 1702.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>see</u> <u>also</u> <u>Lynn v. Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006).   A state court's findings of fact will be upheld "'unless objectively unreasonable in light of the evidence presented in the state court proceeding.'" <u>Lynn</u>, 443 F.3d at 246–47 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003)).  Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." <u>Williams</u>, 529 U.S. at 389.

### 5. <u>Pro</u> <u>Se</u> Status

A petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997). However, in light of Gomez's <u>pro</u> <u>se</u> status, the Court construes his submissions liberally and interprets them "'to raise the strongest arguments that they suggest.'" <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 224 (2d Cir. 2014) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).  This liberal interpretation of the petition "'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983) (quoting <u>Birl v. Estelle</u>, 660 F.2d 592, 593 (5th Cir. 1981)).

**B. Claims for Relief**

As stated above, Gomez seek habeas relief on six separate grounds: (1) that his due process rights were violated when the trial court denied his request for a missing witness charge; (2) that his right to a fair trial was violated when the trial court allowed testimony concerning MS-13 that was not probative and prejudiced Gomez; (3) the trial court denied him his right to a fair trial by instructing the jury to determine whether Witness #6 was an accomplice as a matter of fact; (4) that the prosecution committed prosecutorial misconduct by making certain comments during summation; (5) that his due process rights were violated when the prosecution failed to meet their burden of proof beyond a reasonable doubt; and (6) his sentence was harsh and excessive, thus violating his rights against cruel and unusual punishment.  For the following reasons, the petition is DENIED in its entirety.

### 1. Missing Witness Charge Claim

Gomez seeks habeas relief on the ground that the trial court failed to give the jury a missing witness instruction after the prosecution elected not to call Investigator Pagano as a trial witness. For the following reasons, this claim is denied. [7]

Under New York State law, "the 'missing witness' instruction allows a jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events."  People v. Savinon, 100 N.Y.2d 192, 196 (2003).  A party seeking a missing witness charge must "sustain an initial burden of showing that the opposing party has failed to call a witness who could be expected to have knowledge regarding a material issue in the case and to provide testimony favorable to the opposing party."  People v. Macana, 84 N.Y.2d 173, 177 (1994).

---

[7] The Court notes that Gomez's missing witness charge claim has been exhausted, and Respondent does not dispute the issue of exhaustion.  (See Mem. of Law in Supp. of Resp.'s Opp., July 17, 2018, at 7-9.)

Investigator Pagano was involved in the investigation into Gomez's murder.  At some point, after his involvement in the investigation, Pagano was himself arrested and charged with possession of child pornography.  (Tr. 2903-04.)  At trial, outside the presence of the jury, defense counsel argued that, during the  cross-examination of other witnesses, he should be able  to inquire about Investigator Pagano's involvement in the murder investigation and his subsequent arrest. (Tr. 2903.)   The trial court instructed defense counsel that he was not permitted to mention Investigator Pagano's arrest during argument or the cross-examination of other witnesses.  (Tr. 2904-05.)

After the parties rested, at the charge conference, defense counsel requested a missing witness jury charge. (Tr. 3063.) Defense counsel argued that because there were times that Gomez was alone with Investigator Pagano, it was unknown whether Investigator Pagano made any threats or promises to Gomez.  (Tr. 3064-65.)   Defense counsel further argued that any ambiguity regarding threats or promises made to Gomez would have been cured if the prosecution produced Investigator Pagano as a witness, but that the prosecution chose not to do so given his arrest for child pornography. (Tr. 3067.)  The trial court ruled that defense counsel's argument relied solely on speculation that Investigator Pagano would have material and noncumulative evidence and denied counsel's request for the missing witness jury charge.  The Appellate Division agreed with the trial court and found that defense counsel "failed to make a prima facie showing that the uncalled witness could be expected to have knowledge about a material issues in the case." Gomez, 138 A.D.3d at 1018.  Petitioner's claim about the trial court's failure to give a missing witness charge  is not cognizable on habeas review.  Habeas relief "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not

lie for errors of state law.'") (quoting <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990)).  Habeas relief would only be available if the Appellate Division acted contrary to or misapplied Supreme Court law when it held that the trial court properly denied defense counsel's request for a missing witness charge.

"[A] state prisoner making a claim of improper jury instructions faces a substantial burden."  <u>DelValle v. Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002).  Generally, a petitioner must demonstrate that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violat[ed] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'"  <u>DelValle</u>, 306 F.3d at 1200-01 (quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, (1977)).  Thus, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (per curiam).   "[L]ike the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure so infected the entire trial that the resulting conviction violated due process."  <u>Rodriguez v. Graham</u>, No. 17-CV-3395, 2017 WL 2838144, at *6 (E.D.N.Y., 2017) (internal quotations, citations and alteration omitted); <u>see</u> <u>e.g.</u> <u>Henriquez v. Lee</u>, No. 18-CV-7913, 2019 WL 3306586, at *3 (S.D.N.Y., June 27, 2019) (report and recommendation) ("[a] missing-witness charge is not a federally protected right[.]"), <u>adopted</u> <u>by</u>, No. 18-CV-7913, 2019 WL 3302609, at *1 (S.D.N.Y. July 23, 2019).   Additionally, the Second Circuit has recognized that because "an 'aura of gamesmanship' frequently accompanies requests for missing witness charges," in federal court, district judges are afforded "considerable discretion in deciding when they should and should not be given."  <u>United States v. Gaskin</u>, 364 F.3d 438, 463 (2d Cir. 2004) (internal citations omitted); <u>see</u> <u>also</u> <u>Graham</u>, 2017 WL 2838144, at *7-8

(rejecting habeas claim based on failure to give a missing witness charge because trial courts have discretion whether to give this instruction, the defendant did not meet the requirements for a missing witness charge under New York State law, and the defendant's untimely request for a missing witness charge, which sought to trap the trial court into either giving the missing witness charge or risking error, constituted an obvious attempt at gamesmanship).

Petitioner's claim fails because, as the Appellate Division found, he was not entitled to a missing witness charge under New York State law.[8]  And, it is clear that the trial court's refusal to give this instruction did not violate due process.  Given the overwhelming evidence at trial against Petitioner, the absence of a missing witness charge here could not have possibly prejudiced Petitioner.   Gomez's claim concerning the missing witness charge does not warrant habeas relief and, therefore, is denied.

## 2. __Molineux__ Ruling Claim

Gomez argues that his right to a fair trial was denied for two reasons: (1) the trial court's __Molineux__ ruling itself denied his right to a fair trial; and (2) the prosecution went beyond the bounds of the trial court's __Molineux__ ruling.  For the following reasons, these claims are denied.

### a.  **Trial Court's __Molineux__ Ruling**

Pursuant to New York State law, evidence of prior bad acts by a criminal defendant are admissible "to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan …; (5) the identity of the person charged with the commission of the crime on trial."  People v. Molineux, 168 N.Y. 264, 291 (1901).  Here, the prosecution argued that evidence of MS-13 gang membership, rules, and

---

[8]  While defense counsel argued that Investigator Pagano may have made threats or promises made to Gomez when he and Gomez were alone, defense counsel never provided any offer of proof that Investigator Pagano was likely to testify to any such threats or promises.  Of course, if any such threats or promises had been made to Petitioner, Petitioner himself would have been aware of that fact and could have informed his counsel.

hierarchy were highly probative of Gomez's motive and intent.  The trial court ruled, prior to trial, that:

> [a]ll of the items relating to gang membership, specifically gang membership, gang rules, hierarchy, are highly probative of defendant's motive and intent here.  They are not only probative of the defendant's motive, but they are probative of defendant's intent – of the identity of the defendant as the perpetrator, and, also, they are necessary as background material relating to items that are intrinsically intertwined with the events, here, which is the people's allegation that this a gang-style assassination.  (Tr. 86.)

The trial court also allowed testimony of a gang expert, citing to People v. Edwards, 295 A.D.2d 270 (1st Dept. 2002).  (Tr. 87.)  In Edwards, the Appellate Division found that the trial court acted within its discretion in admitting evidence of defendant's gang membership, through the testimony of an expert witness, which provided a "sufficient connection between defendant's gang membership and the crime."  Edwards, 295 A.D.2d at 271; see also People v. Tai, 224 A.D.2d 328 (1st Dept. 1996).

Pursuant to the trial court's ruling, former members of MS-13, including Witness #1, Witness #5, Witness #4, Witness #3, and Witness #2 each testified regarding MS-13 rules and practices, gang hierarchy, and the consequences for disobeying the gang rules, specifically the repercussions for being considered a "snitch."

### b. Gomez's Challenge to the Trial Court's Molineux Ruling is Procedurally Barred

In his direct appeal, Gomez argued that the prosecution violated his right to a fair trial when the prosecutor went beyond the bounds of the trial court's Molineux ruling.  (See App. Div. Br., at 37-45.)  However, Gomez failed to argue to the Appellate Division that the trial court's Molineux ruling itself violated his fair trial rights.  Because Gomez failed to raise this claim on his

24

direct appeal in state court, it is deemed exhausted but procedurally barred.  O'Sullivan, 526 U.S. at 848.

To overcome the procedural bar, Gomez must demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 750.  Gomez has not shown cause for the default and actual prejudice, or that failure to consider his Molineux claim will result in a fundamental miscarriage of justice.  Thus, Gomez cannot overcome this procedural bar.

Even so, and in an abundance of caution, this Court addresses Gomez's claim on the merits. As a general matter, the admissibility of evidence in state court is wholly a matter of state law and is therefore not subject to habeas relief, barring a showing that Petitioner's due process rights were denied such that he was deprived a fundamentally fair trial.  See Estelle v. McGuire, 502 U.S. 62, 75 (1991).  More specifically, "[a] habeas claim asserting a right to relief on Molineux grounds must rise to the level of constitutional violation … because Molineux is a state law issue."  Roldan v. Artuz, 78 F. Supp. 2d 260, 276–77 (S.D.N.Y. 2000) (citations omitted).

"The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule would not be unconstitutional."  Green v. Herbert, No. 01-CV-1881, 2002 WL 1587133 at *12 (S.D.N.Y. July 18, 2002) (citations omitted); see also Jones v. Stinson, 94 F. Supp. 2d 370, 391–92 (E.D.N.Y.)  As stated above, under New York State law, evidence of prior bad acts are admissible to prove the crime charged when it tends to establish motive, intent, and identity.  Molineux, 168 N.Y. at 291.  Additionally, evidence of gang membership provides context for a motive to commit murder.  See Washington v. Artuz, No. 07-CV-7769, 2013 WL 1285877,

at *2, 13 (S.D.N.Y. Mar. 29, 2013); see also Gonzalez-Martinez v. Kirkpatrick, No. 16-CV-5119, 2017 WL 3891649, at *11 (E.D.N.Y. Sept. 6, 2017) (finding that even if the trial court erroneously admitted testimony regarding the petitioner's alleged MS-13 gang membership, "the error does not amount to the denial of petitioner's right to a constitutionally fair trial.").

In this case, the trial court's ruling with respect to Gomez's prior bad acts clearly fell within permissible Molineux evidence.  Evidence of Gomez's gang membership, the rules of the gang, and gang hierarchy gave context to explain the motive and intent for Gomez and his co-defendants to murder Bonilla upon suspicion that he was a "rat," and the identity of Gomez as the perpetrator based on his gang affiliation and tattoos.  As such, the trial court's ruling was within the limits proscribed by Molineux and state law  Gomez has not shown that the trial court's Molineux ruling violated his right to a fair trial.

Therefore, this claim is denied.

### c.  Gomez's Exhausted Claim Concerning the Evidence Admitted at Trial Has No Merit

In his petition, Gomez also argues that the "testimony elicited as a result of the ruling went beyond the parameters set by said ruling" and that the trial court's Molineux instruction was "ill-suited to cure the prejudice that was caused[.]"  (Pet. at 7-8.)  In his direct appeal, Gomez argued that the prosecution violated his right to a fair trial by violating the trial court's Molineux ruling and that the trial court's Molineux instruction to the jury was insufficient to cure the prejudice created by the trial testimony.  (See App. Div. Br., at 37-45.)  The Appellate Division found that the prosecution did not violate the trial court's ruling, and that Gomez did not object to the Molineux charge as given, and, thus, did not preserve his claim for appellate review, but, in any event, his claim was without merit.  Gomez, 138 A.D.3d at 1018.  It is well established that the failure to preserve a claim for appellate review is considered an independent and adequate state

ground, and that, even if the state court also addresses the merits, the claim is still procedurally barred.  See Harris v. Reed, 489 U.S. 255, 264 (1989); see also Velasquez, 898 F.2d at 9.  Here, Gomez fails to show cause, prejudice, or that a fundamental miscarriage of justice would result if he is barred from habeas review; therefore, Gomez cannot overcome this procedural bar.  See Coleman, 501 U.S. at 750.  Moreover, as explained below, Gomez's claim also fails on the merits.

As discussed supra, the admissibility of evidence in state court is wholly a matter of state law and is therefore not subject to habeas relief, barring a showing that Petitioner's due process rights were denied such that he was deprived a fundamentally fair trial.  Estelle, 502 U.S. at 75.  "[N]ot all erroneous admissions of [unduly prejudicial] evidence are errors of constitutional dimension."  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).

Here, the testimony and evidence admitted by the trial court was within the permissible bounds of its Molineux ruling.  And, it is clear that the admission of this evidence did not deprive Petitioner of a fair trial.

Gomez argues that the prosecution elicited testimony that violated the trial court's ruling outlining permissible Molineux evidence.  To support his allegation, Gomez states that "there was testimony of gang members in prison who would kill specific witnesses, unrelated murders; testimony that Petitioner participated in the beating of one of the witnesses as initiation into the gang." [9]  (Pet. at 7.)  Further, because evidence demonstrated that MS-13 was a vicious and ruthless

---

[9] It is unclear from Gomez's petition what testimony he is alleging went beyond the trial court's parameters.  In his appellate brief, Gomez alleged that former MS-13 gang members who testified on behalf of the prosecution, including Witness #5, Witness #2, Witness #4, and Witness #6, testified regarding unrelated murders.  (App. Div. Br. at 40.)  The examples of testimony cited by Gomez referenced murders committed by MS-13 in general and the fact that new members of a MS-13 clique were expected to kill members of rival gangs.  (App. Div. Br. at 40.)  As discussed herein, the pressure on new members to kill or be killed provided a probative and relevant explanation as to why Witness #2 felt compelled to participate in Bonilla's murder.  Allowing the jury to hear evidence about how MS-13's rules were enforced—in sometimes deadly fashion—was certainly appropriate in the context of this case.

gang, Gomez argues that he was prejudiced because the trial court allowed the jury to draw the conclusion that he possessed the same propensity of being vicious and ruthless.  (Pet. at 7.)

The prosecution, however, did not violate the trial court's ruling and, even assuming for the sake of argument that it did, there was certainly no due process violation here.  The evidence cited by Gomez in his petition seemingly falls under the parameters set forth by the trial court.  For example, the trial court ruled that evidence of gang membership, rules, and hierarchy were all probative to establish motive and intent for the murder.  The concept of a "green light" was a common theme between witnesses testifying about the gang rules, specifically referring to the consequences for cooperating with law enforcement.  (Tr. 239, 514, 610, 870, 1142.)  Gang members identified as "rats" or "snitches" would receive a "green light," and it was for that reason that Bonilla was murdered by Gomez, Zuniga, and Witness #2.  (Tr. 878, 1009, 1142.)  Further, the fact that former MS-13 members who testified at Gomez's trial exposed themselves to receiving a "green light," and was also relevant and probative testimony, and fell within the parameters established by the trial court.  Additionally, evidence pertaining to the violent nature of the gang was relevant to explain the rules within MS-13, specifically the consequences for failing to comply with the rules and orders from within the gang.  For example, the different types of beatings and fear of death explained why Witness #2, a probationary member of the gang, felt compelled to participate in Bonilla's murder.  (Tr. 1113-1115, 1143.)  Gomez has not shown that the trial court's pre-trial ruling was violated and, even assuming for the sake of argument, that it was, Gomez has not demonstrated that his right to a fair trial was violated by the evidence the prosecution ultimately introduced at trial.

28

Additionally, Gomez alleges that the trial court's instructions were insufficient to cure the alleged prejudice caused by the evidence elicited at trial.[10]  (Pet at 8.)  The trial court charged the jury that:

> There is evidence in this case that the defendant was a member of a gang known as MS-13.  That evidence was not offered and must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged in this case.  It was offered as evidence for your consideration on the question of the defendant's intent, motive and as background information.  If you find the evidence believable, you may consider it for those limited purposes and for none other. (Tr. 3343-44.)

Any potential prejudice was cured by the trial court's <u>Molineux</u> instruction.  <u>See</u>, <u>e.g.</u>, <u>Roldan v. Artuz</u>, 78 F. Supp. 260, 282 (S.D.N.Y. Jan. 6, 2000); <u>see</u> <u>also</u> <u>Gonzalez-Martinez v. Kirkpatrick</u>, at *11 ("Such a limiting instruction lessens the potential prejudice of a witness's testimony because it sufficiently clarifies the limited purpose for which the jury could consider this testimony.").  Here, Gomez has failed to demonstrate that the trial court's instruction was inadequate to cure any potential prejudice.

As such, Gomez cannot establish that his right to a fair trial was violated by either the testimony presented by the prosecution, or the curative instruction given by the trial court.  Thus, habeas relief is not warranted based upon these claims.

### 3.  Jury Instruction Concerning Witness #6's Status as an Accomplice

Gomez seeks habeas relief on the grounds that the trial court erroneously instructed the jury on Witness #6's accomplice status as a question of fact, rather than as a matter of law.  For the following reasons, this claim is denied.

 At trial, the court gave instructions to the jury regarding certain witnesses' accomplice status, and  the requirement under New York law that accomplice testimony be corroborated.  (Tr.

---

[10]  As noted earlier, defense counsel did not object to the <u>Molineux</u> charge given by the trial court.  (Tr. 3055.)

3340-41; N.Y. Crim. Proc. Law § 60.22(1).)  The trial court instructed the jury that it was for them to determine whether Witness #6 was an accomplice.  The jurors were instructed that if they determined that Witness #6 was not an accomplice, they should treat his testimony as they would any other witness.  The jurors were also instructed that if, on the other hand, they found that Witness #6 was an accomplice, then his testimony would require corroboration, meaning that the jurors could not convict Gomez based solely on Witness #6's testimony unless they found that there was other evidence tending to connect Gomez to the commission of the crime.[11]  (Tr. 3340-41.)  The trial court also instructed the jury that Witness #2 was an accomplice and that this determination was not for the jury to make.  Thus, Witness #2's testimony required corroboration. (Tr. 3343.)

On appeal, Petitioner challenged the instruction concerning Witness #6.  The Appellate Division ruled that Gomez had not preserved his claim for appellate review and also found, in any event, that the trial court properly instructed the jury regarding Witness #6's accomplice status. Gomez, 138 A.D.3d at 1019.  The Appellate Division concluded that the trial court's instruction was permissible because the record contained competing inferences regarding as to whether Witness #6 was an accomplice.  Id. at 1019 (citing People v. Visich, 57 A.D.3d 804, 806 (N.Y. App. Div. 2d Dep't 2008)).

Gomez's claim is procedurally barred from habeas review as the Appellate Division rejected this challenge on independent and adequate state grounds.  In his petition, Gomez fails to

---

[11]  At the charge conference, the trial court raised this issue of Witness #6's status as a potential accomplice, stating that, based on the testimony at trial, there was an argument that the jury should determine whether Witness #6 was an accomplice.  (Tr. 3050.)  Initially, defense counsel stated that he did not want a charge on that subject; however, after the trial court read its proposed instruction concerning the issue of Witness #6's status as an accomplice, defense counsel indicated that it would be an appropriate charge.  (Tr. 3052.)  Defense counsel then proceeded to argue in favor of this instruction over the prosecution's objection.  As discussed above, the trial court ultimately decided to grant defense counsel's request and charged the jury that the question of whether Witness #6 was an accomplice was a factual one for them to determine.  (Tr. 3052-53.)

show cause, prejudice, or that a fundamental miscarriage of justice would result if he is barred from habeas review; therefore, Gomez cannot overcome this procedural bar.  See Coleman, 501 U.S. at 750.  Regardless, the Court addresses his claim on the merits.

After reviewing the trial record, the Court agrees with the Appellate Division that the trial court's instruction was appropriate as a matter of New York law.  Moreover, Gomez's claim that the jury was improperly instructed on Witness #6's accomplice status is not cognizable on habeas review.  Habeas relief would only be available if the Appellate Division acted contrary to or unreasonably applied federal law when it held that the trial court properly instructed the jury concerning Witness #6's status as an accomplice.  There is, however, "no federal rule prohibiting a conviction based, in whole or in part, on uncorroborated accomplice testimony."  Nylander v. Smith, No. 07-CV-0457, 2010 WL 1292297, at *4-5 (E.D.N.Y. Mar. 30, 2010); see also Caminetti v. United States, 242 U.S. 470, 495 (1917) ("there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them").  As such, Gomez's claim is based solely on New York State law regarding accomplice status and its effect on corroboration.  See N.Y. Crim. Proc. Law § 60.22(1).

For Gomez's claim to be cognizable on federal habeas review, he must demonstrate that "'the ailing [jury] instruction by itself so infected the entire trial that the resulting conviction violat[ed] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'"  DelValle, 306 F.3d at 1200-01 (quoting Henderson v. Kibbe, 431 U.S. 145, 154, (1977)).  Gomez is unable to do so.  First, the jury instruction given by the trial court was not erroneous.  The trial court did not misstate New York State law, and based on the evidence presented at trial, it was appropriate for the trial court to allow the jury to determine Witness #6's

accomplice status.  Additionally, even if the instruction were in error, Gomez cannot demonstrate a violation of constitutional dimension occurred.

As such, the Court denies Gomez's habeas claim concerning the jury instructions that addressed Witness #6's status as an accomplice.

### 4.  Prosecutorial Misconduct Claim

Gomez claims that, during the prosecution's summation, the prosecutor: (1) denigrated defense counsel; (2) improperly vouched for the credibility of witnesses; and (3) appealed to the sympathy of jurors.  (Pet. at 9.)  As a result of these allegations, Gomez contends that he was denied his right to a fair trial.  For the reasons stated below, this claim is denied.

The Appellate Division rejected Gomez's claim on the grounds that the claim was not preserved for appellate review, and in any event, the prosecutor's summation comments constituted fair comment and permissible inferences.  Gomez, 138 A.D.3d at 1019.  Here, Gomez has failed to show  cause, prejudice, or that a fundamental miscarriage of justice would result if he is barred from habeas review; therefore, Gomez cannot overcome this procedural bar.  See Coleman, 501 U.S. at 750.  Moreover, the Court finds that Gomez's claim fails on the merits.

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding."  Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).   To amount to constitutional error, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted).  Rather, the prosecutor's comments "must represent 'egregious misconduct.'"  Celleri v. Marshall, No. 07-CV-4114, 2009 WL 1269754, at *17 (E.D.N.Y. May 6, 2009) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)); see also United States v.

Shareef, 190 F.3d 71, 78 (2d Cir. 1999) ("Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" (internal quote omitted)). Thus, to warrant relief, the Court must conclude that the comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643).

"[B]oth New York and federal law recognize the prosecutor's right to rebut attacks on witness credibility during summations." McManus v. Vann, No. 18-CV-3800, 2019 WL 3767538, at *11 (E.D.N.Y. Aug. 9, 2019), appeal dismissed, No. 19-2884, 2020 WL 8024517 (2d Cir. Mar. 30, 2020), cert. denied, No. 20-6025, 2021 WL 78277 (U.S. Jan. 11, 2021).  The prosecution is permitted to rebut arguments raised during a defense counsel's summation, "'even to the extent of permitting the prosecutor to inject his view of the facts to counter the defense counsel's view of the facts.'" Ayala v. Walsh, No. 05-CV-1497, 2009 WL 4282034, at *6 (E.D.N.Y. Nov. 23, 2009) (quoting Readdon v. Senkowski, No. 96-CV-4722, 1998 WL 720682, at *13 (S.D.N.Y. Oct. 13, 1998)). "Where a prosecutor's statement is responsive to comments made by defense counsel, the prejudicial effect of such objectionable statements is diminished." Pilgrim v. Keane, No. 97-CV-2148, 2000 WL 1772653 at *3 (E.D.N.Y. Nov. 15, 2000).

In defense counsel's summation, he argued to the jury that the prosecution's witnesses, specifically the former gang members, were not credible and the jury could not rely on their testimony.  (Tr. 3117, 3779, 3121-23, 3139-42.)  Defense counsel further expressed disbelief that Witness #4, Witness #1, and Witness #5 were actually in fear of retribution for their testimony. (Tr. 3143, 3145-46.)  Defense counsel also went through the evidence in the case piece by piece and argued that the prosecution's case did not make sense.

The prosecutor was permitted to respond to defense counsel's arguments.  In his petition, Gomez specifically challenges the prosecutor's comment that defense counsel's presentation of evidence was akin to throwing the pieces of a jigsaw puzzle all over the courtroom.  (Pet. at 9.) Relatedly, the prosecutor also argued that defense counsel's summation tactic was to separate the evidence, rather than look at how the pieces of evidence fit together.  These comments were permissible rebuttal made in direct response to defense counsel's summation comments.  (Tr. 3195.)

The Court also finds meritless Gomez's argument that the prosecutor violated his right to a fair trial by appealing to the sympathy of the jury.  Defense counsel argued to the jury that Witness #4, Witness #6, and Witness #5 were not actually in fear for their lives when they testified against Gomez.  Thus, it was permissible for the prosecutor to rebut that argument and reiterate the potential consequences the witnesses faced by cooperating with law enforcement.

Additionally, in his summation, defense counsel attacked Witness #2's credibility and repeatedly referred to Witness #2 as a liar.  To rebut those arguments, the prosecutor addressed the alleged inconsistencies in Witness #2's testimony, and used the other testimony and evidence presented over the course of the trial to argue that the jury could rely on Witness #2's testimony. (Tr. 3208-09, 3215-17.)  The Court finds that the prosecutor's comments with respect to Witness #2 were permissible and did not violate Gomez's right to a fair trial.

Further, the Court does not find that Gomez has shown substantial prejudice as a result of the prosecutor's statements.  United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curiam).  Gomez faces a heavy burden that he cannot meet in light of the court's jury instructions. Even though defense counsel did not object to the prosecutor's comments, the trial court still instructed the jury that what the attorneys say during their summations is argument submitted for

the jury's consideration, and nothing said by the attorneys during summations constitutes evidence. (Tr. 3109-10.)  Thus, Gomez cannot demonstrate substantial prejudice.

As such, the Court does not find that the prosecutor's remarks constituted egregious misconduct, nor that Gomez demonstrated substantial prejudice.   Accordingly, Gomez's prosecutorial misconduct claim is denied.

### 5.  Insufficient Evidence Claim

Gomez argues that he is entitled to habeas relief because the evidence presented by the prosecution failed to prove his guilt beyond a reasonable doubt of Murder in the Second Degree or Conspiracy in the Second Degree.  (Pet. at 10.)  Gomez also argues that his guilty verdict was against the weight of the evidence.  (Pet. at 10.)  In his direct appeal, Gomez presented both claims to the Second Department and the court denied his claims, finding that his claims were unpreserved for appellate review, and, in any event, the evidence presented against Gomez was legally sufficient to establish his guilt beyond a reasonable doubt.  Gomez, 138 A.D.3d at 1018.  The Appellate Division denied Gomez's claim on independent and adequate state grounds, and Gomez has failed to show cause, prejudice, or that a fundamental miscarriage of justice would result if he is barred from habeas review.  Therefore, Gomez cannot overcome this procedural bar.  See Coleman, 501 U.S. at 750.  Moreover, Gomez's claim also fails on the merits.

As an initial matter, Gomez's claim that the jury's verdict was against the weight of the evidence is not cognizable here as it does not raise a federal question.  McKinnon v. Superintendent, Great Meadow Correctional Facility, 422 F. App'x 69, 75 (2d Cir. 2011).  Because this claim is based solely on state law, it is unreviewable in a federal habeas corpus proceeding. See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991), Butler v. Cunningham, 313 F. App'x 400, 401 (2d Cir. 2009); Smith v. Lee, No. 11-CV-0530, 2014 WL 1343066, at *10

(E.D.N.Y. Mar 31, 2014) ("[i]t is well settled that a 'weight of the evidence' claim is distinct from an 'insufficiency of the evidence' claim and is a state claim based on N.Y.C.P.L. § 470.15(5) that is not reviewable in a federal habeas proceeding.") (citing McKinnon, 422 F. App'x at 75).

As to Petitioner's habeas claim based on the sufficiency of the evidence, Petitioner "bears a very heavy burden." See United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009). A criminal conviction will not be disturbed if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Policano v. Herbert, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt") (quoting Jackson, 443 U.S. at 324). When considering a claim of legally insufficient evidence, the facts are viewed in the light most favorable to the verdict. See Garbutt v. Conway, 668 F.3d 79, 80-81 (2d Cir. 2012) (per curiam). "In considering a petition for writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime." Green v. Abrams, 984 F.2d 41, 44-45 (2d Cir. 1993).

Having considered each of the crimes for which Gomez was convicted, the Court concludes that the Appellate Division's upholding of the convictions is neither contrary to nor an unreasonable application of clearly established federal law and its decision was not based on an unreasonable determination of the facts.

As mentioned above, Gomez was convicted of one count of Murder in the Second Degree and one count of Conspiracy in the Second Degree. Pursuant to the New York State Penal Law,

"[a] person is guilty of murder in the second degree when, with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."  N.Y. Penal Law § 125.25(1).  Serious physical injury means "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(1).  Further, dangerous instrument means "any instrument . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury."  N.Y. Penal Law § 10.00(13).  Additionally, "[a] person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct."  N.Y. Penal Law § 105.15.

In his petition, Gomez argues that the following problems surrounding the trial amounted to insufficient evidence: (1) Witness #2 was not a credible witness; (2) Gomez was not with Witness #6 when the gun was purchased; (3) Witness #6's testimony suggested alternative theories that a rival gang was responsible for Bonilla's murder; (4) there was no forensic evidence tying him to the crime; and (5) the video surveillance was insufficient to prove that it was actually his van, or that he was a passenger in said van.  (See Pet. at 9-12.)

This argument is meritless.  When the Court considers the trial record in its entirety, there is substantial evidence to support the jury's determination of Gomez's guilt.  Over the course of the trial, the prosecution presented evidence via testimony of numerous former MS-13 gang members, including Witness #2, Gomez's co-conspirator in Bonilla's murder.  Witness #2 testified to Gomez's role in planning and executing Bonilla's death.  Specifically, both Gomez and Zuniga told Witness #2 prior to the day of the murder to get ready because they had a "green light" to kill

Bonilla for being a "rat". (Tr. 1142.) Witness #2 further testified that on December 2, 2010, Gomez came to his house with Zuniga, driving his van, and told him to put on double clothing, gave him gloves, and told him to leave his cell phone behind because they were "going to do it now." (Tr. 1147-49.) Witness #2 further explained that after leaving his house, Gomez drove them to OK Petroleum gas station where he made a call from a pay phone. (Tr. 1156.) After leaving the gas station, Witness #2 testified that they went straight to Bonilla's house to pick him up, then drove to Emkay Street, parked, and walked down the block to the wooded area behind the dead end. (Tr. 1164-67.) After walking five to seven feet into the woods, Zuniga, Gomez, and Witness #2 each shot Bonilla one time, and left him lying on the ground choking on his own blood. (Tr. 1176-80, 1184.)

Witness #2's testimony was also corroborated by the other evidence at trial. The medical examiner confirmed that Bonilla was shot three times, and that any one of the three gunshot wounds could have killed him. (Tr. 2589, 2605.) Phone records indicated that a phone call was placed from OK Petroleum gas station to Bonilla at 8:34 p.m., and video surveillance from the grocery store captured Gomez's van travelling towards Bonilla's house at 8:38 p.m. (Tr. 2796.) Gomez himself told Investigator Hughes that he called Bonilla from the pay phone at OK Petroleum on December 2, 2010 and picked up Bonilla afterwards. (Tr. 2751-53, 2758.)

Although Gomez points to discrepancies in Witness #2's testimony, he has not met the high burden of demonstrating that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Flowers v. Fisher, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting Jackson, 433 U.S. at 324) (internal quotation marks omitted). Ultimately, "[f]ederal habeas courts are not free to reassess fact specific credibility judgments by juries or to weigh conflicting testimony. On collateral review [the] Court must presume that the jury resolved any questions of credibility in

favor of the prosecution."  <u>Anderson v. Senkowski</u>, No. CV-92-1007, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992) (internal citations omitted).

Accordingly, Gomez's insufficient evidence claim is without merit and is denied.

**6.  Harsh and Excessive Sentence Claim**

Gomez contends that his sentence of twenty-five years of imprisonment followed by five years of post-release supervision is harsh and excessive.  (<u>See</u> Pet. at 12-13.)

It is well settled that an excessive sentence claim, such as Gomez's, does not present a required federal constitutional issue when the received sentence "is within the range prescribed by state law."  <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see also</u> <u>Taylor v. Connelly</u>, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014).   Under New York state law, the maximum sentence permitted for a violation of Murder in the Second Degree, a Class "A" Felony, is an indeterminate term of imprisonment of twenty-five years to life without parole.  N.Y. Penal Law §§ 125.25; 70.00(3)(a)(i).  Additionally, under New York state law, the maximum sentence permitted for a violation of Conspiracy in the Second Degree, a Class "B" Felony, is an indeterminate term of imprisonment of at least three years to twenty-five years, with the minimum sentence not to exceed one-third of the maximum term imposed.  N.Y. Penal Law §§ 105.15; 70.00(2)(b), (3)(i).  Thus, Gomez's sentence of twenty-five years of imprisonment to life for Murder in the Second Degree, and eight-and-one-third years to twenty-five years of imprisonment for Conspiracy in the Second Degree both fall within what is permitted by applicable statute and do not present a federal constitutional issue.  Therefore, this claim fails on the merits.

**7.  Request for Discovery**

On January 28, 2021, Gomez filed a one-page letter seeking unspecified evidence and documents from the Respondent.  The only specific materials sought by the letter are a copy of

Witness #2's confession—which Gomez claims he never personally saw—and an accompanying log sheet.

For a § 2554 petition:

discovery is only allowed if the district court, acting in its discretion, finds 'good cause' to allow it. This 'good cause' standard is satisfied where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.

Campbell v. Artus, No. 14-CV-5594, 2019 WL 1434976, at *4 (E.D.N.Y. Mar. 29, 2019) (quoting Beatty v. Greiner, 50 F. App'x 494, 496–497 (2d Cir. 2002)). The Supreme Court's decision in Cullen v. Pinholster, 563 U.S. 170, 178 (2011), also places additional hurdles on a petitioner's ability to obtain discovery of evidence for any claims in a § 2554 petition that a state court has denied on the merits. See Beltran v. Keyser, No. 15-CV-7201, 2018 WL 1175134, at *3 (E.D.N.Y. Mar. 5, 2018).

The  Court finds the "good cause" standard is not satisfied here. Accordingly, Gomez's motion for discovery is denied. Gomez never identifies how this video or the unspecified other evidence would support the claims in his petition. Furthermore, not only is the video irrelevant to the claims in his petition, but even if Gomez himself never personally saw this video, he has not alleged that his attorney was denied this video or any other evidence prior to trial.

### III. CONCLUSION

Because the Court has considered all of Gomez's arguments and found them meritless, the petition is DENIED.

A certificate of appealability shall not issue because Gomez has not made a substantial showing that he was denied any constitutional rights. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purposes of any appeal. Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

At Respondent's request, the Court permitted Respondent, given the circumstances of this case, to file the trial record under seal.  Because this opinion refers to the trial record, the Court is issuing this opinion under seal.  A copy of this sealed opinion is, on the date of filing, being provided only to Respondent for the sole purpose of allowing Respondent a brief window to propose any redactions to this Order.  Any proposed redactions by Respondent must be submitted to the Court by March 30, 2021 at 5 p.m.  In the event Respondent fails to file any proposed redactions by that deadline, this Order will be immediately unsealed in its entirety, publicly filed, and mailed to Petitioner.  In the event Respondent submits any proposed redactions, the Court will promptly rule on the proposed redactions.  The Clerk of the Court shall not mail a copy of this Order to Petitioner or close the case until directed to do so by the Court.

**SO ORDERED.**

Dated:  March 26, 2021
Central Islip, New York

                                        /s/ (JMA)
                                 JOAN M. AZRACK
                                 UNITED STATES DISTRICT JUDGE